United States District Court
Southern District of Texas

**ENTERED**

February 15, 2018

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| TALAL NIMER EL HAJ, | § | |
|     Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:16-CV-534 |
| | § | |
| LORIE DAVIS,[1] Director, Texas Department | § | |
| of Criminal Justice, Correctional Institutions | § | |
| Division, | § | |
|     Respondent. | § | |

## REPORT AND RECOMMENDATION

Petitioner Talal Nimer El Haj, a state prisoner proceeding pro se, initiated this action by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Docket No. 1.)  A Texas jury convicted Petitioner for attempted capital murder and assessed a punishment of thirty (30) years' imprisonment.  The evidence at trial showed that Petitioner broke into his estranged wife's residence (despite a protective order) and then shot his wife, one of his daughters, and his daughter's boyfriend—who had all tried to hide from Petitioner by barricading themselves in a bathroom.

After unsuccessfully availing himself of state appellate and post-conviction review, Petitioner now seeks federal habeas corpus relief.  He claims that his state court trial counsel rendered ineffective assistance in two ways: (1) failure to request an involuntary act jury instruction; and (2) failure to request an instruction on a lesser included offense.  (*See* Docket No. 2, at 2-3.)  Although Petitioner initially asserted four federal habeas claims, he has

---

[1] Effective May 1, 2016, Lorie Davis replaced William Stephens as the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Davis "is automatically substituted as a party."  FED. R. CIV. P. 25(d).

withdrawn two of those claims, conceding (as he must) that they are unexhausted.  (Docket No. 14, at 14-15.)  Pending is Respondent's motion for summary judgment.  (Docket No. 8.)

After carefully considering the pleadings and the state court record in light of the deferential standard of review mandated by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), the undersigned concludes that Petitioner has not shown a basis for federal habeas corpus relief.  Petitioner's ineffective assistance of counsel claims are meritless, if not frivolous.  Among other things, he has not—and cannot on this record—show a reasonable probability that the outcome of his trial would have been different had counsel requested the instructions at issue.  Petitioner has thus failed to show that the state court's rejection of his ineffective assistance claims involved an unreasonable application of federal law.  For the reasons discussed further below, the undersigned recommends that the District Court grant Respondent's summary judgment motion and deny habeas relief.  It is further recommended that the District Court not issue a certificate of appealability.

## I.  BACKGROUND

### A.    State Court Proceedings

On August 21, 2012, a grand jury in Hidalgo County, Texas, indicted Petitioner on three counts of attempt to commit murder and one count of attempt to commit capital murder of multiple persons.[2]  (Docket No. 9-7, at 6-7.)  Petitioner pleaded not guilty and stood trial in the 389th Judicial District Court.  In moving for summary judgment, Respondent described the evidence at trial as follows:

---

[2] The facts and procedural history are taken from the State Court Record filed in this case (Docket Nos. 9-11), the documents submitted by Petitioner and Respondent, and the Thirteenth Court of Appeals' decision addressing Petitioner's direct appeal, *El Haj v. State*, No. 13-13-00326-CR, 2014 WL 4402380 (Tex. App.- Corpus Christi–Edinburg Aug. 29, 2014, pet. ref'd).

At trial, Officer Basaldua testified that he responded to a call "for an unwanted subject." 12 RR 18. He and two other officers arrived at a large, one-story, gated home and gained entrance to the property.12 RR 19–20. Through what appeared to be a kitchen window, he could see a female holding a phone, "and she had blood on her." 12 RR 22. Thereafter, he heard a car "taking off" and ran back to the front of the house where his fellow officers "had the suspect in custody." 12 RR 23. He then entered the house and "made contact with two females," both of whom were "hysterical" and one of whom was "covered in blood." 12 RR 24. Upon checking the rooms of the house, the officers found one room with "two injured females" and "blood pretty much all over the floor." 12 RR 26. The younger woman had a bullet wound to her center neck, and the older woman was trying to hold the younger woman's neck. 12 RR 26. After attending to the younger woman, they asked the older woman to get up and then realized that she had been shot in her legs and had blood coming from her legs. 12 RR 27.

Officer Basaldua identified El Haj at trial as the suspect they detained. 12 RR 34–35. Another responding officer, Miguel Angel Monforte, testified that he apprehended El Haj after observing a "male suspect trying to open the gate noticing the flashlight and then running towards the back, towards a pool area." 12 RR 44. The officer also identified El Haj at trial. 12 RR 44.

Yet another responding officer, Ray Garza, testified to [] observing and photographing a victim's gunshot wound to the neck. 12 RR 65. Officer Garza also testified that he recovered from the scene and processed as evidence a handgun and a magazine clip. 12 RR 93–96. He also processed a handgun holster that another officer recovered from the scene. 12 RR 96. And additionally, he found and processed a knife and a revolver found in the kitchen area. 12 RR 123–104, 111. The revolver contained six empty casings, which were also collected. 12 RR 112. The officer also testified that upon exiting the home, he found a white BMW with all four tires flattened by about an in[ch] wide cut to each. 12 RR 119.

Fabian Doty testified that Miriam El Haj was his girlfriend, whom he had known approximately five years. 13 RR 7–8. He further testified that Miriam's father, El Haj, did not like his daughters around boys, and that, to his knowledge, El Haj was unaware of Fabian's relationship with Miriam. 13 RR 9. Fabian later learned that Patricia, Miriam's mom and El Haj's wife, had filed for divorce from El Haj. 13 RR 10–11. He was concerned for Miriam's safety as a result. 13 RR 11. He was also aware that there was later a court order preventing El Haj from going to Patricia's home. 13 RR 13.

Regarding the night of the incident, Fabian testified that he, Miriam, Patricia, and Miriam's sisters, Suzanne and Layla were at Patricia's home. 13 RR 15. Suzanne came into the room and [alerted] them that her father, El Haj, was outside. 13 RR 21–22. Fabian then heard a noise that he believed was "him popping the tires." 13 RR 23. By then, Fabian, Miriam, Suzanne, Layla, and Patricia were all gathered in the same bedroom, with the door locked, and

Suzanne had called 9-1-1. 13 RR 25–26. They then heard a loud noise like someone was breaking in. 13 RR 25. At a 9-1-1 operator's advice, the five of them next barricaded themselves in a bathroom. 13 RR 27–30. Eventually, El Haj made his way to the bathroom door. 13 RR 32. El Haj stuck his right hand through the doorway holding a gun, while Miriam attempted the keep the door shut. 13 RR 32–33. The gun then fired, and Fabian was shot. 13 RR 33. The bathroom door opened, and Miriam went out to confront her father. 13 RR 35. She grabbed the hand in which El Haj was holding a gun. 13 RR 36.

Suzanne testified that her mother, a pediatrician, was the primary income earner for the family because her father was typically unemployed. 13 RR 59–60. She was also aware that sometime before the incident her mother filed for divorce and there was a protective order put in place against her father. 13 RR 61–62. The order specifically prohibited El Haj from returning to the family's home. 13 RR 63.

Suzanne explained that on the night of the incident she was in a bedroom when she heard the car alarm going off and saw her father walking [toward] the house. 13 RR 65. She went and told her mother. 13 RR 65. Like Fabian, she testified that all five of them gathered in a bedroom and, at the police's advice, later hid in a bathroom. 13 RR 65. She also testified that her father began breaking into the bathroom and that, as her mother and Miriam attempted to the keep the bathroom door shut, her father reached his arm through the door "and he shot the gun." 13 RR 66–67. She testified that Miriam left the bathroom, and El Haj, her father, tried pointing his gun at Miriam's head. 13 R 68–69. Suzanne testified that she remembers them fighting and that, at some point, her father shot Miriam's throat, and her mother crawled to Miriam to try to cover it. 13 RR 69.

Layla reiterated that her mother was the primary breadwinner for the family. 13 RR 94–95. She testified that she was aware of her parents' pending divorce and that her mother initiated the divorce due to her father's infidelity. 13 RR 98. Layla was aware that her mother asked her father to leave the home and that there was a restraining order preventing him from coming to the home. 13 RR 98–100.

Layla testified that on the night of the incident Suzanne told her that their father was approaching the home and that her sister seemed "freaked out" by this. 13 RR 103–104. She too testified that the five of them entered a bathroom and closed the door. 13 RR 105. Eventually, her father started pushing on the bathroom door, got his gun through it, and it shot. 13 RR 107–108. Miriam, who is "stubborn" left the bathroom and jumped on her father trying to get the gun from his hand. 4 RR 108–109. But El Haj hit Miriam's face and knocked her to the ground. 4 RR 109. As Miriam pushed on the barrel of the gun to move it away from her, El Haj fired the gun "so the bullet went through [Miriam's] hand." 4 RR 109–110. After being shot in the hand, Miriam fell back, and El Haj tried aiming the gun at Miriam's forehead. 13 RR 112. El Haj then "missed entirely" and shot

4

Miriam in the neck. 13 RR 11. Afterward, El Haj "had a satisfied look on his face." 13 RR 111.

Patricia testified that once she and her husband moved to Texas and began raising their family there, she was the primary income earner. 13 RR 158–159. Her husband, El Haj, however, had expensive tastes and, using checks "from the office," purchased "extravagant things" like "ponies, zebras, peacocks," as well as antiques and cars. 13 RR 159–161. Patricia testified that the financial struggle caused marital problems, but, if she complained, El Haj would punish her by not talking to her for days. 13 RR 162. She testified that they began fighting a lot and growing apart, that she had problems at her office because of him, and that, eventually, she discovered he was having an affair with the daughter of a former maid. 13 RR 165–169. Patricia hired a lawyer and filed for divorce. 13 RR 170. She confronted El Haj about the affair and told him that she was filing for a divorce. 13 RR 171–172. El Haj began threatening Patricia, and so she obtained a temporary restraining order. 13 R 172–176.

On the night of the incident, her daughter Suzanne told Patricia she had seen her father outside. 13 RR 179. Following that, Patricia heard car alarms, got scared, and called the police. 13 RR 179–181. Scared and screaming, at the dispatcher's advice, she and the other four crowded into one room—first Miriam's, and after that the bathroom. 13 RR 181–182. Once in the bathroom, she saw a gun "by the sliding door" to the bathroom and then, "he shoot." 13 RR 184. She later saw Miriam go toward her father outside the bathroom, heard a gunshot, and then saw El Haj overpower Miriam and put the gun to her head. 13 RR 186. As El Haj was trying to "engage the bullet," Miriam "moved her head and he went and he shot her neck." 13 RR 186. She picked up Miriam, saw a hole in her throat, and held her hands to her neck. 13 RR 187. As Patricia was on the ground holding Miriam, El Haj shot her twice, hitting her in the legs. 13 RR 187.

Miriam testified that she believed her father, El Haj, to be misogynistic, and that she would "fight with him about that type of stuff." 14 RR 12–14. Miriam, too, testified to her mother's work ethic and to her father's propensity for purchasing material items with money her mother had hard earned. 4 RR 13–15. Miriam explained that her mother was aware of Miriam's relationship with Fabian, but that she was too scared to tell her father. 14 RR 16–18. Miriam also testified that she was aware that her father was not being faithful to her mother. 14 RR 20. Miriam believed that her mother remained in a relationship with a man who was unfaithful and whom she was financially supporting for quite some time because "he's aggressive and … she probably thought that maybe he would act out." 14 RR 21. Miriam testified that once her mother contacted an attorney, initiated a divorce and kicked El Haj out of the house, her father would sometimes return and ask to speak with them. 14 RR 22. Once her father asked Miriam to meet him outside a restaurant and to convince her mother to join. 14 RR 22. They met with El Haj and spoke, but her mother afterward proceeded with the divorce and obtained a temporary restraining order against her father. 14 RR 23.

On the night of the incident, Miriam heard car alarms going off and saw the lights from her car and her mom's car flashing. 14 RR 27–28. When Suzanne approached Miriam and her mother to tell them that El Haj was on the property, Miriam told Suzanne to call the police. 14 RR 29. Miriam, like the others, testified that she, her sisters, her mother, and Fabian hid in her bedroom first and then[, in response to] the 9-1-1 dispatcher's advice, in a bathroom where they were hiding when they first heard a gunshot. 14 RR 30. El Haj was able to push through the bathroom door, and Miriam saw that he had a gun. 14 RR 30–31. She tried to hold her father back and heard another gunshot. 14 RR 32. She reached for the "neck" of the gun, but was "only grabbing it for a short period of time and it went off again." 14 RR 34. She then "felt weak" and "apathetic" like she was "going to give up." 14 RR 35. After that, the gun was pointed at her for a split second before it went off and the pressure of the bullet hitting her pushed her backward. 14 RR 35. She fell and then knew where she was hit. 14 RR 25. She then felt a pool of blood beneath her before she realized she also had a hole in her hand. 14 RR 35–36.

(Docket No. 8, at 4-11.)  Respondent's summary of the evidence is consistent with the trial record.[3]

After the presentation of evidence, a jury found Petitioner guilty beyond a reasonable doubt of all the crimes charged in the indictment.  The jury sentenced Petitioner to twenty years for each count of attempted murder and to thirty years' imprisonment on the single count of attempted capital murder, all of which were to run concurrently.

Petitioner appealed his conviction and sentence to the Thirteenth Court of Appeals for Texas.  *El Haj v. State*, No. 13-13-00326-CR, 2014 WL 4402380, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 29, 2014, pet. ref'd).  His first issue on appeal was that his convictions for both attempted murder and attempted capital murder violated his right against double jeopardy.  Petitioner also argued (among other things) that the trial court erred in not submitting a jury instruction on the lesser-included offense of deadly conduct and that his trial counsel

---

[3] In support of his federal habeas claims, Petitioner provides his own version of the facts.  (*See* Docket No. 2, at 4.)  On habeas review, however, the evidence at trial is considered in the light most favorable to the verdict.  *See Weeks v. Scott*, 55 F.3d 1059, 1061 (5th Cir.1995).

rendered ineffective assistance by failing to request an instruction that his conduct was not culpable if it resulted from acts that were not voluntary. The Thirteenth Court of Appeals agreed with Petitioner in part on his double jeopardy claim and vacated his three convictions for attempted murder, but the Court affirmed his conviction and 30-year sentence for attempted capital murder. *Id.* at *1-2. The Court denied Petitioner's other claims on appeal and otherwise confirmed his conviction. *Id.* at * 2-5.

Petitioner, with retained counsel, filed a state application for a writ of habeas corpus raising four claims alleging ineffective assistance of trial counsel. (Docket No. 11-3, at 80-90.) In two of those claims, Petitioner asserted that his attorney rendered constitutionally deficient performance by failing to request jury instructions: 1) "pursuant to Section 6.01 of the Texas Penal Code which prevents culpability if the accused's conduct is not a voluntary act"; and 2) on the lesser included offense of deadly conduct.[4] (*Id.* at 85-86.) The trial court entered findings of fact and conclusions of law recommending that the Texas Court of Criminal Appeals deny habeas relief. (Docket No. 11-4, at 7-11.) On July 13, 2016, the Court of Criminal Appeals denied habeas relief without written order. (Docket No. 10-15, at 1.)

**B.   Federal Review**

Petitioner filed a timely federal petition for a writ of habeas corpus. He initially raised four grounds for relief:

- counsel was ineffective in failing "to request an involuntary act instruction pursuant to Section 6.01 of the Texas Penal Code" (Ground One);

- counsel was ineffective in failing to request "a jury instruction on the lesser included offense of deadly conduct" (Ground Two);

---

[4] In his state writ, Petitioner also argued that his trial attorney rendered ineffective assistance of counsel by failing to object "to the prosecutor's statement that juror unanimity was not required" and by failing "to object to testimony that portrayed [him] as a despicable character." (Docket No. 11-3, at 87-88.)

- the "trial court erred in not submitting, sua sponte, the lesser included offense of deadly conduct to the jury charge" (Ground Three); and

- the "trial court erred, in allowing the admission of the sexually explicit video . . . [during the] punishment phase" (Ground Four).[5]

(Docket No. 1, ¶ 12.)  Petitioner's first two grounds raise ineffective assistance of counsel claims that he had also advanced in state court.  (Docket No. 1, ¶ 12 (Grounds One and Two).)   As to the third and fourth grounds, however, Petitioner asserts these claims for the first time in his federal petition.  (*Id.* (Grounds Three and Four).)  He also filed a memorandum of law discussing each claim.  (Docket No. 2.)

In moving for summary judgment, Respondent argues that Petitioner's claims alleging trial court error should be dismissed because they are unexhausted and procedurally barred. (Docket No. 8, at 15-19.)   Respondent further argues that Petitioner's ineffective assistance claims are without merit and that Petitioner has failed to show "that the [Texas Court of Criminal Appeal's] decision [rejecting these claims] was an unreasonable application of clearly established federal law or an unreasonable application of the facts in light of the evidence presented." (*Id.* at 26, 29.)

Petitioner filed a reply brief.  (Docket No. 14.)  As to his claims alleging trial court error (Grounds Three and Four), Petitioner concedes that "[t]hese claims were not properly exhausted in the court," and he "voluntarily withdraws these claims but reserves the right to allege such claims at a future date." (Docket No. 14, at 14-15.)  As such, Petitioner's claims alleging trial

---

[5] As Petitioner described it, "the video was [Petitioner] and a young woman engaging in anal intercourse, peppered with language which may have been interpreted by [the] jury as vile, offensive, and vulgar." (Docket No. 2, at 18.)  Petitioner had recorded the video himself on his cell phone. (*Id.* at 17.)  The "young woman" was the 14-year-old daughter of the housekeeper employed while Petitioner was still living with his wife (Patricia).  Petitioner described his sexual relations with this under-aged minor as a "tryst." (*Id.*)

court error need not be further addressed in this report.  Petitioner's remaining claims alleging ineffective assistance of counsel (Grounds One and Two) will be analyzed in light of the standard that applies on federal habeas review.

## II.  STANDARD OF REVIEW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence.  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens."  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (stating that a "criminal trial is the 'main event' at which a defendant's rights are to be determined").  The States "possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights."  *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

If a petitioner has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review.  "[T]ime and again," the Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'"  *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (quoting *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013)).  As mandated by AEDPA, an inmate may only secure relief after showing that the state court's rejection of his claim was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2).

Petitioners arguing legal error in state court decisions must comply with § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Gray v. Epps,* 616 F.3d 436, 439 (5th Cir.2010) (citing *Williams v. Taylor,* 529 U.S. 362, 404–08 (2002)). To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)). In contrast to "ordinary error correction through appeal," AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice systems . . . ." *Woods*, 135 S. Ct. at 1376 (quotation omitted). A petitioner must "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams*, 529 U.S. at 413. "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different

conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  State court findings are "presumed to be correct" unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

These standards will be applied in considering Petitioner's grounds for relief.

### III. ANALYSIS

Both of Petitioner's federal claims assert that trial counsel provided ineffective representation.  Courts assess an attorney's representation under the framework set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521.  Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  In reviewing ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to

eliminate "the distorting effects of hindsight." *Id.* at 689. An ineffective assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689–90.

With regard to the prejudice requirement, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 694; *Wiggins*, 539 U.S. at 534.

Here, Petitioner's ineffective assistance of counsel claims were considered and rejected by the state habeas court. While "[s]urmounting *Strickland*'s high bar is never an easy task[,]" *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), ineffective-assistance claims that the state courts have adjudicated on the merits warrant a "doubly deferential judicial review" under AEDPA. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). A state court's adjudication of *Strickland* claims "must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101. "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."[6] *Id.* at 105.

---

[6] As the Fifth Circuit has explained, "the test for federal habeas purposes is *not* whether [an inmate] made that showing [required by *Strickland*]. Instead, the test is whether the state court's decision--that [the inmate] did *not* make the *Strickland*-showing--was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim." *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003); *see also Charles v. Thaler*, 629 F.3d 494, 501 (5th Cir. 2011) (same) (citing *Schaetzle*).

A.   **Failure to Request an Involuntary Act Jury Instruction**

In his first ground for relief, Petitioner alleges that he was denied his right to effective assistance of counsel when his attorney "failed to request an involuntary act [jury] instruction pursuant to Section 6.01 of the Texas Penal Code."   (Docket No. 1, ¶ 12 (Ground One).) According to Petitioner, "all the complaining witnesses' testimonies were corroborating that a struggle took place [when] the weapon discharged." (Docket No. 2, at 5.)  From this, Petitioner argues that he "did not voluntarily discharge his weapon and thus was entitled to a jury instruction on the voluntariness of his conduct." (*Id.* at 7.)   Since Petitioner fired his gun multiple times, presumably he is suggesting that none of the shots was a voluntary act.

In Texas, "[i]t is settled law that criminal liability must be supported by proof of both a criminal act and a culpable mental state." *Alford v. State,* 866 S.W.2d 619, 624 (Tex. Crim. App. 1993).  With regard to the criminal act requirement, § 6.01(a) of the Texas Penal Code provides that "[a] person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession."[7]  TEX. PENAL CODE ANN. § 6.01(a) (West 2003).  Voluntariness is defined as "the absence of an accidental act, omission or possession." *Alford,* 866 S.W.2d at 624.

In the context of an ineffective assistance claim involving counsel's failure to request a jury instruction on voluntariness, another federal court has explained:

> A defendant is entitled to an instruction regarding the voluntariness of his actions when he timely requests an instruction on the issue and it is raised by the evidence. *Brown v. State,* 955 S.W.2d 276, 278–79 (Tex. Crim. App. 1997). "Voluntariness" refers only to one's physical bodily movements. *Rogers v. State,* 105 S.W.3d 630, 638 (Tex. Crim. App. 2003).  "If those physical movements are the nonvolitional result of someone else's act, are set in motion by

---

[7] The culpability requirement is addressed in § 6.02, which states that "a person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires."  TEX. PENAL CODE ANN. § 6.02.

some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus, that movement is not voluntary." *Id.* The issue of voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state. *Adanandus v. State,* 866 S.W.2d 210, 230 (Tex. Crim. App. 1993). But "involuntary act" is not the same defensive theory as "accident." *Rogers,* 105 S.W.3d at 639. . . . Moreover, an instruction on voluntariness under § 6.01(a) is necessary only if the accused admits committing the act or acts charged and seeks to absolve himself of criminal responsibility for engaging in the conduct. *Trujillo,* 227 S.W.3d at 169; *Bell v. State,* 867 S.W.2d 958, 962 (Tex. App.-Waco 1994, no pet.). "When a person claims the involuntary act defense he is conceding that his own body made the motion but denies responsibility for it." *Rogers,* 105 S.W.3d at 639 n.30 (quoting Sanford H. Kadish, *Excusing Crime,* 75 Cal. L. Rev. 257, 259 (1987)).

*Reyes v. Thaler*, No. 4:10-CV-608-Y, 2011 WL 4850078, at *11 (N.D. Tex. July 19, 2011), report and recommendation adopted, No. 4:10-CV-608-Y, 2011 WL 4849822 (N.D. Tex. Oct. 12, 2011).

To prevail on his ineffective assistance claim, Petitioner must show both that his trial counsel performed deficiently in failing to request a voluntariness instruction and that he was prejudiced as a result. *Strickland*, 466 U.S. at 700. "Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim." *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997). Here, it is unnecessary to address the issue of counsel's alleged deficiency because it is obvious that Petitioner has failed to meet the prejudice requirement. *See Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one.").

As noted, prejudice requires a habeas petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "[S]elf-serving conclusory statement[s] that" counsel's deficient

14

performance prejudiced the defense "standing alone, fall[] far short of satisfying *Strickland*'s prejudice element." *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001). A petitioner must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693.

Petitioner argues that the evidence showed that his gun "discharged several times" as a result of a struggle with his daughter (Miriam) and her boyfriend (Fabian). (Docket No. 2 at 6.) According to Petitioner, "[a]ll five witnesses testified at trial and every single one stated without exception, that [Petitioner's] gun had discharged during the struggle with Miriam and Fabian." (*Id.*) Although Petitioner does not specifically address the prejudice requirement, he presumably asserts that the jury would have acquitted him had a voluntariness instruction been given.

Petitioner's conclusory statements about the evidence fall far short of meeting his burden to show that he was prejudiced as a result of counsel's failure to request an instruction on voluntariness. In determining whether prejudice has been shown, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Here, the trial record reflects overwhelming evidence that supported the conclusion that Petitioner's conduct in shooting the victims was both voluntary and intentional. Among other things, the evidence showed:

- Petitioner had extravagant spending habits, and he was about to lose his main source of money as a result of the divorce proceedings instituted by his wife, whose job as a pediatrician provided the family's primary source of income;

- Petitioner had come to the residence of his estranged wife despite a protective order prohibiting him from doing so;

- Once on the property, Petitioner slashed the tires on a vehicle;

- Petitioner went into a storage room and retrieved a gun that he knew was there;

- After becoming aware that Petitioner was on the property, one of his daughters called 911;

- Petitioner broke into the back door of the residence;

- Petitioner's wife (Patricia), three daughters (Miriam, Layla, and Suzanne), and Miriam's boyfriend (Fabian) went into a bedroom, locked the door, and—on the advice of the 911 operator—attempted to barricade themselves in a bathroom (located inside the bedroom);

- Petitioner fired a round into the locked bedroom door and forced the door open;

- Petitioner then went to the bathroom;

- As Patricia and Miriam were trying to keep the bathroom door shut, Petitioner pushed on the door, reached through an opening with the gun in his hand, and fired a shot, which hit Fabian;

- Miriam then attempted to take the gun from Petitioner, and Petitioner shot her in the hand;

- After shooting Miriam in the hand, Petitioner aimed the gun at her forehead;

- Miriam moved, and Petitioner shot her in the neck;

- Layla testified that her father "had a satisfied look on his face" after shooting Miriam in the neck;

- Patricia rushed to help Miriam, who was bleeding profusely;

- As Patricia was on the floor trying to stop the bleeding, Petitioner shot her twice in the legs;

- Petitioner attempted to flee from the scene;

- After Petitioner was arrested, a letter was found in his pocket in which he gave written instructions (to whoever found the letter) designating who should receive all his remaining belongings—none of which he left to his wife or daughters.

In light of such evidence at trial, Petitioner cannot show any likelihood that the jury would have acquitted him on the basis that he acted involuntarily each time he pulled the trigger and shot one of the victims.[8]   On the facts here, the notion that Petitioner involuntarily or

---

[8]  In this case, the evidence relating to voluntariness is closely tied to the evidence relating to Petitioner's intent to commit the crime.  At trial, the principal argument by Petitioner's counsel was that the State had failed to prove intent.  For example, during closing, counsel argued that

accidentally shot all three victims is far-fetched, if not absurd.[9]  The evidence strongly suggests that Petitioner came to the residence with the intent to harm his wife and daughters and that he acted voluntarily each step of the way.  Far from showing that Petitioner involuntarily fired his gun multiple times, it appears much more likely from the evidence that the victims' struggle to protect themselves prevented Petitioner from doing even more harm.

Because Petitioner has not—and cannot—show that he was prejudiced as a result of counsel's failure to request a voluntary act jury instruction, his ineffective assistance claim on this issue is meritless.  Petitioner has not come close to showing that the state habeas court misapplied *Strickland* in denying this claim.

## B.   Failure to Request a Lesser Included Offense Jury Instruction

Petitioner's second claim faults counsel for "failing to request a jury instruction on the lesser included offense of deadly conduct."  (Docket No. 1, ¶ 12 (Ground Two).)  Here again, Petitioner argues that "[a]ll of the State's witnesses testified that a struggle took place between the victims and [Petitioner], which occurred during the discharging of the weapon."  (*Id.*)  As such, Petitioner asserts that the victims' injuries "actually occurred by the performed act of a struggle," thereby warranting a jury instruction "of the lesser-included offense of deadly

---

Miriam was shot "[d]uring a struggle" and that there was no evidence that Petitioner "had the specific intent to commit the offense of murder."     (Docket No. 10-3, at 41.)  Later in his argument, counsel reminded the jury: "Don't forget when Miriam was shot, it was during the struggle."  (*Id.* at 53.)  As is apparent from the jury's verdict, however, they did not accept this argument; instead, they found by their verdict that the evidence showed beyond a reasonable doubt that Petitioner intended to commit murder.

[9] Petitioner's suggestion that he fired the gun during a struggle with Fabian is disingenuous. (Docket No. 2, 6.)  It is true that Fabian testified that he followed Petitioner from the bedroom in an attempt to prevent him from obtaining other weapons, and it is true that Fabian fought with Petitioner after he caught up to him.  But that struggle occurred *after* Petitioner had left the bedroom and *after* Petitioner had already fired the shots that struck Miriam, Patricia, and Fabian.

conduct."[10]   (Docket No. 2, at 9.)   This ineffective assistance claim is frivolous.   Petitioner has shown neither deficient performance nor prejudice.

As the Supreme Court emphasized in *Strickland*, "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effects of hindsight."   466 U.S. at 689.   "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."   *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)).   "Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."   *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (quoting *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999)).   And, as the Supreme Court warned, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence."   *Strickland*, 466 U.S. at 689–90.

Here, Petitioner has been unable to resist the temptation to second-guess his trial counsel with the benefit of hindsight.   This is particularly inappropriate in this case, given that it is clear from the record that Petitioner actively participated in—and insisted on—the strategic decision that he now criticizes.   The following colloquy occurred during Petitioner's trial:

> **Counsel**: And you and I have been talking about it and you wrote me a letter asking me if there was anything less that could be used in this case.   And during the voir dire, I went into lesser included offenses, aggravated assault, deadly conduct and I had prepared and I have filed a motion on your behalf, Defendant's

---

[10] Petitioner appears to now fault his attorney for failing to essentially admit that he committed the offense of deadly conduct: "Additionally, since deadly conduct is not a result oriented offense, Applicant's counsel could have proven the offense by merely proving applicant engaged in the conduct without the additional requirements that a specific that a specific result was caused with the requisite criminal intent."   (Docket No. 2, at 11.)   Had counsel followed this course, and had Petitioner been convicted only on the charge of deadly conduct, Petitioner would no doubt now be claiming ineffective assistance on that basis.

Requested Jury Charge on Deadly Conduct.  And you and I talked about that. Just because I filed it, doesn't mean that the judge will grant that.  Do you understand that?

**Petitioner**: I understand.

**Counsel**: And what would happen if she doesn't grant it, well, denied, we're back to what's on the indictment.  And if she would grant it, then what would be my argument, and you have decided for me not to go forward and ask the Court to do anything with this instruction that you're requesting deadly conduct, not to present it to the Court?

**Petitioner**: Yes, I did.

. . . .

**The Court**: You asked him what?

**Petitioner**: Not to accept a lesser charge.

. . . .

**The Court**: You do realize, with all due respect, Mr. Garza, legal strategy is not the province of your client.  It is yours.

**Counsel**: Yes, I understand.

**The Court**: It is his right to testify or not, but legal strategy is yours.

**Counsel**: Yes.  And he understands that because we discussed it several times . . .

(Docket No. 10-2, at 62-63.)

On his direct appeal, Petitioner argued that the state trial court erred by failing to sua sponte include a jury instruction on the lesser-included offense of deadly conduct.  *El Haj*, 2014 WL 4402380 at *3.  In rejecting this claim, the court of appeals emphasized the "strategic nature of the decision" by a defendant on whether to request a lesser-include offense instruction.  *Id*. (quoting *Tolbert v. State*, 306 S.W.3d 776, 781 (Tex. Crim. App. 2010)).  "Not requesting a lesser-included offense instruction has been described by the court of criminal appeals as an 'all or nothing strategy of going for an outright acquittal.'"  *El Haj*, 2014 WL 4402380 at *4 (quoting

19

*Tolbert*, 306 S.W.3d at 781.)   Given that Petitioner and his counsel had agreed to pursue this strategy, the court of appeals rejected Petitioner's claim that the trial court erred in failing to give an instruction on the lesser-include offense of deadly conduct.

In addressing Petitioner's ineffective assistance claim in his state habeas application, the state habeas court[11] made the following findings and conclusions:

> The Court takes judicial notice that [Petitioner], when asked by his trial attorney whether he wished counsel to urge a request that the trial court instruct the jury on Deadly Conduct as a lesser offense, expressly stated he did not wish such a request to be urged and expressly stated he did not wish inclusion of such an instruction in the jury charge.

> The Court FINDS that this election, of [Petitioner] himself, to forego urging a request for such an instruction and to advise the trial court that he did not wish its inclusion in the jury charge, was the product of reasonable trial strategy in the nature of an 'all or nothing' defense as to the count of conviction.

> The Court takes judicial notice of controlling authority that trial counsel is not ineffective for pursuing a particular strategy unless so outrageous that no competent counsel would engage in it.   *Tolbert v. State*, 306 S.W.3d 776 (Tex. Crim. App. 2010) (string cite omitted).

(Docket No. 11-4, at 8-9.)

Here again, Petitioner has not come close to showing that the state court's decision was contrary to or an unreasonable application of *Strickland*.   Even if Petitioner's ineffective assistance claim were considered without applying the deferential lens required by AEDPA, it would still fail.   His attempt to second-guess a strategic decision that he had agreed to and insisted on is frivolous.

Although it is unnecessary to address the prejudice prong of the *Strickland* standard (since Petitioner has clearly not shown deficient performance), it is noteworthy that Petitioner has failed to meet this requirement as well.   Petitioner has failed to show that there is a

---

[11] This was the same state judge who presided over Petitioner's trial.

reasonable probability that the jury would have acquitted him on the attempted capital murder charge had a lesser-included deadly conduct instruction been given.  Based on the evidence presented at trial, *see supra* Part III.A., there is every reason to believe that the jury would still have returned a verdict of guilty on the charge of attempted capital murder.[12]

Because Petitioner has failed to show that the state habeas court's decision was contrary to or an unreasonable application of *Strickland*, the Court should reject his ineffective assistance claim based on counsel's strategic decision to not request a lesser-included offense instruction.

## IV. CONCLUSION

For the foregoing reasons, the undersigned recommends that Respondent's Motion for Summary Judgment (Docket No. 8) be GRANTED, that Petitioner's § 2254 habeas petition (Docket No. 1) be DENIED, and that this action be DISMISSED.  For the reasons discussed below, it is further recommended that Petitioner be denied a certificate of appealability.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although Petitioner has not yet filed a notice of appeal, the § 2254 Rules instruct that the District Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, RULES GOVERNING SECTION 2254 PROCEEDINGS.

---

[12] This conclusion approaches near certainty when considered in light of the jury's guilty verdict on each of the three counts of attempted murder.  As to each of the attempted murder counts, the jury had the option of finding Petitioner guilty as to the lesser-included offense of aggravated assault, but instead they found Petitioner guilty as to the higher-level offense.  (*See, e.g.*, Docket No. 11-2, at 30-31 (trial court's instruction on the "lesser included offense of Aggravated Assault"); *id.* at 35 (jury verdict finding Petitioner guilty of attempted murder rather than the lesser-included aggravated assault offense).

Because the undersigned recommends the dismissal of Petitioner's § 2254 action, it is necessary to address whether Petitioner is entitled to a certificate of appealability (COA).

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To warrant a COA as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); s*ee also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* standard to a COA determination in the context of a habeas corpus proceeding). An applicant may also satisfy this standard by showing that "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *see also Jones*, 287 F.3d at 329. As to claims that a district court rejects solely on procedural grounds, the prisoner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Here, Petitioner's two remaining ineffective assistance claims should be dismissed on their merits. For the reasons explained in this report, the undersigned believes that reasonable jurists would not find debatable the conclusion that these claims lack merit, nor are the issues presented adequate to deserve encouragement to proceed further. Accordingly, Petitioner is not entitled to a COA.

## NOTICE TO THE PARTIES

The Clerk shall send copies of this Report and Recommendation to Petitioner and counsel for Respondent, who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on February 14, 2018.

Peter E. Ormsby
United States Magistrate Judge